UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-CV-80877-MATTHEWMAN

ROBERT L. HAMILTON,

      Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security
Administration,

      Defendant.

_____/



## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 20, 24]

**THIS CAUSE** is before the Court upon Plaintiff, Robert L. Hamilton's ("Plaintiff")

Motion for Summary Judgment with Supporting Memorandum of Law [DE 20], and Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security Administration's ("Defendant")

Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to

Plaintiff's Motion for Summary Judgment [DE 24]. The parties have consented to magistrate

judge jurisdiction. [DE 11]. The issue before the Court is whether the record contains

substantial evidence to support the denial of benefits to Plaintiff and whether the correct legal

standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

### I.   FACTS

On June 1, 2006, Plaintiff filed a Title II application for a period of disability and

disability insurance benefits, asserting a disability on-set date of January 15, 2004. [R.

315-19].[1]   Also on June 1, 2006, Plaintiff filed a Title XVI application for supplemental social security income, asserting the same disability on-set date.  [R. 312-14].   Both applications were denied initially and upon reconsideration.  [R. 152-59].   Following a hearing on January 19, 2010, the Administrative Law Judge M. Dwight Evans (the "ALJ") issued a decision on March 23, 2010, denying Plaintiff's request for benefits.  [R. 125-45].   Plaintiff requested review of the ALJ's decision denying his claims, and the case was remanded by the Appeals Council on September 9, 2011, instructing the ALJ to further evaluate the claimant's earnings record during the period at issue, obtain updated medical evidence, further evaluate Plaintiff's mental impairments, and obtain evidence from a vocational expert if warranted.  [R. 146-50]. Following a video hearing on March 6, 2013, the ALJ issued a decision on September 25, 2013, again denying Plaintiff's request for benefits.  [R. 16-36].   A request for review was filed with the Appeals Council and denied on April 20, 2015.  [R. 1-6].

## A.  Initial Hearing Testimony

The ALJ held an initial hearing on January 19, 2010.  [R. 39].   Plaintiff stated that he was sixty-three years old at the time of the hearing.  [R. 43].   He received his college degree in Finance.  [R. 43-44].   Plaintiff testified that he had worked at City Corp Global Real Estate and was responsible for the credit card division, the strategic planning, the real estate decisions, construction, and asset management.  [R. 44].   He explained that his duties were global and he had to review strategies, often traveling around the world for real estate, within the divisions of the corporation.  *Id.*   Plaintiff testified that he frequently gave presentations to the business "on reviewing their current real estate needs, and what the future requirements would be based on the economic conditions within those geographic areas."  [R. 45].   He estimated that he had to lift

---

[1] All references are to the record of the administrative proceeding filed by the Commissioner at Docket Entry 16.

about twenty pounds in performing his duties, which was the weight of his carry-on bag when he had to travel.   *Id.*   Plaintiff testified that he had to stop working in January of 2004 because he was diagnosed with seizures of the brain, which precluded him from performing some of his functions at work.   *Id.*   He stated that he was having various types of seizures at that point in time.   [R. 46].

Plaintiff testified that he had seizures that would "go through [his] body into [his] brain and could last for 10 to 30 seconds" and also seizures that would be very stressful on his body that would last for half a minute.   [R. 46].   He stated that after the seizures he needs to rest for three to thirty minutes because of the physical impairment on his body.   *Id.*   Plaintiff explained that the seizures were more likely to occur when he was under stress or when he was concentrating on issues at work.   *Id.*   He stated that his decisions at work were stressful when he had to meet deadlines, when they involved considerable amounts of money, and when they involved the safety and life of individuals who were working around the world.   [R. 46-47].

Plaintiff testified that he was diagnosed with a brain tumor at the end of 1999 or beginning of 2000, which is when he began his medical treatment.   [R. 47].   According to Plaintiff, he has seizures approximately four to six times a month, which prohibit him from focusing on his responsibilities and impair him from making good decisions.   [R. 50].   Plaintiff explained that he is cognizant of what is going on around him during his seizures.   *Id.*   He testified that in the last five to seven years his short-term memory has deteriorated and he has trouble remembering what happen in the previous one to five hours.   *Id.*

Regarding his activities of daily living, Plaintiff stated that his wife takes care of things around the house, such as cooking, shopping, and cleaning.   [R. 51].   He testified that the heaviest weight he lifts around the house is a laundry basket, approximately five to ten pounds.

*Id.* According to Plaintiff, his condition has gotten better since he stopped working because he does not have the stress of his job he was under previously. *Id.* In order to manage his stress, Plaintiff stated that he stays out of social or political conflicts and has his wife do the majority of tasks that would bring on stress for him. [R. 52]. Additionally, he testified that his wife keeps a calendar of what will be happening daily to remind Plaintiff of his daily activities. *Id.*

The ALJ then proceeded to question Plaintiff. *Id.* Plaintiff testified that he did a three-day testing and evaluation with Dr. Greenberg in 2005. *Id.* He also stated that his last MRI was around October of 2009, and he was getting MRIs every six to nine months since 2000. [R. 53]. This last MRI showed that Plaintiff's condition was the same from when his last MRI was done. [R. 54]. According to Plaintiff, Dr. Robinson, Plaintiff's primary physician, is the one who approved all of his MRIs. *Id.*

Plaintiff testified that his brain seizures precluded him from traveling for work. *Id.* He stated that he had a team of people, that he would ask someone to travel for him, and that he also had staff including a secretary. [R. 55]. Plaintiff claimed that, when he was working, he would have his staff assist him with things such as making airplane reservations. [R. 55-56].

In regard to his daily activities, Plaintiff testified that he usually will walk his dog, read the news or watch it on television, read by the beach, go to the movies with his wife, or play golf once or twice a month. [R. 60]. As far as traveling, Plaintiff stated that he and his wife do not travel frequently but they will go back to New Jersey once or twice a year or visit friends and family in California once a year. *Id.* He testified that he does not contribute to any of the household chores. *Id.*

Then, Plaintiff's wife, Donna Hamilton testified at the hearing in front of the ALJ. [R. 62-63]. Mrs. Hamilton testified that, at the time of the hearing, she had been married to

Plaintiff for two and a half years.  [R. 64].  She stated that she met Plaintiff at a global real estate conference in 1998, which was sponsored by CORENET.  [R. 68].  Mrs. Hamilton testified that on an average day, Plaintiff will walk the dog, watch the news, go on the computer, fish, go to the beach, read, golf, and talk to people in the neighborhood.  [R. 70-71].

Mrs. Hamilton testified that she had lived with Plaintiff since 2001 and observed him on a daily basis.  [R. 72].  With regard to Plaintiff's seizures, Mrs. Hamilton stated that they occurred more frequently when he was working.  *Id.*  She described them as just randomly coming on and explained that Plaintiff will have to close his eyes for a minute, look like he is nauseated, and have to rest sometimes after they occur.  *Id.*  Mrs. Hamilton testified that the seizures did not all last the same amount of time, but that the length of them would vary anywhere from a few minutes to an hour.  [R. 73].  In regards to the frequency of the seizures, Mrs. Hamilton stated that they used to occur four to six times a day but that now Plaintiff could have approximately a half dozen in a week.  [R. 74].  She said that the seizures occur after anything stressful, such as Plaintiff's dad coming to visit, if they have to be somewhere on time, or if Plaintiff goes to the grocery store and forgets what he was supposed to get there.  [R. 75]. In order to alleviate Plaintiff's stress, Mrs. Hamilton makes a list for him every day of what his and her activities are that day, she makes the social arrangements for them, she makes him decaf coffee, she sends him to an acupuncturist, she helps him with his diet, makes sure he drinks enough water, and tries not to react if he gets confused because that upsets him more.  [R. 75-76].

## B.  Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

5

Plaintiff reported to Dr. Kathryn Robison, his primary care physician, for his "dizzy spells" beginning in 2000.   [R. 422-29].   He complained of dizziness, rectal bleeding, and anxiety.   [R. 473-92].   Plaintiff had multiple MRIs of his brain done between November 8, 2000, and May 11, 2005, which showed signal abnormality involving the medial and anterior left temporal lobe.   [R. 424-45, 441, 495-510].   Dr. Robison stated that "[d]ifferential diagnosis includes a low grade glioma, infection, mesial temporal sclerosis, and inflammatory disease." [R. 509].   Plaintiff continued to see Dr. Robison for follow-up visits, which showed no significant change in size or shape of the lesion.   Plaintiff also continued to get MRIs of his brain every 6-9 months.

Plaintiff started seeing a neurologist, Dr. John Vester, in 2000.   [R. 816-26, 415-46]. Plaintiff was seeing Dr. Vester on a regular basis to monitor his benign brain tumor.   Plaintiff reported to Dr. Vester on November 13, 2000, complaining of episodes "of lightheadedness and a wave going through his body associated with paleness while talking on several occasions." [R. 421].   An MRI showed a "left temporal mass without any mass effect which was nonenhancing."   *Id.*   Plaintiff reported that he had these "spells" for the prior six months, occurring anywhere from once or twice a month to three to five times per day.   *Id.*   Plaintiff had another MRI done on August 27, 2001, which showed no change, and Dr. Vester noted, on September 25, 2001, that Plaintiff was still having his "monthly unusual spells without loss of consciousness."   [R. 420].   Dr. Vester stated that the spells could be partial simple seizures with autonomic features.   *Id.*

Plaintiff reported back to Dr. Vester on April 30, 2002.   [R. 419].   Plaintiff stated that he was having fewer spells since his medication, Trileptal, was increased.   *Id.*   Dr. Vester noted that his MRI showed a "stable left medial temporal lesion."   *Id.*

6

On December 2, 2002, Plaintiff saw Dr. Vester again.   [R. 418].   Plaintiff reported that he was only having seizures every three months and these were associated with him skipping his midday medication.   *Id.*   Plaintiff returned on July 21, 2003, noting that his MRIs showed no change.   *Id.*   He also claimed he had "rare auras" and "often skip[ed] his midday dose of Trileptal."   *Id.*

Plaintiff reported back to Dr. Vester on February 10, 2004, alleging that he started having more frequent seizures in November of 2003, and that the seizures occur approximately five to six times a day.   [R. 417].   He also complained of brief "stabs of pain in the posterior head." *Id.*   Dr. Vester noted that Plaintiff was under stress because he "was recently told he was one of 3000 employees to lose their jobs."   *Id.*   Dr. Vester stated that an MRI of Plaintiff's brain did not show a change in the size of his temporal lobe lesion, but the seizure frequency increase could be attributed to maturing of the epileptogenic lesion.   *Id.*   Dr. Vester recommended that Plaintiff be "out on temporary medical leave."   *Id.*   On March 23, 2004, Plaintiff saw Dr. Vester and noted a decreased frequency of his seizures and feeling calmer since being at home. [R. 416].

Plaintiff reported to Dr. John Greenberg, another neurologist, in December of 2004.   [R. 448-54].   Plaintiff complained of continued seizures that were brought on by stress, short term memory impairment, a shorter attention span and decreased concentration, losing his train of thought in conversation, and depression.   [R. 450-51].   Dr. Greenberg performed a comprehensive behavioral neurological examination, which revealed "significant difficulty in his short-term memory, attention-concentration capability, mental processing, and train of thought in conversation."   [R. 451].   Further, Dr. Greenberg performed a ten-word memory list on Plaintiff, which indicated "residual difficulty with verbal memory."   *Id.*   The doctor also noted

7

that Plaintiff had difficulty "performing mental calculations and did so slowly [and] inaccurately." [R. 452]. Dr. Greenberg concluded that Plaintiff's seizure disorder caused Plaintiff to develop "cognitive neurological impairments that affect his short-term memory, attention-concentration capability, mental processing speed, train of thought in conversation, reading capability, and executive functions." *Id.* Moreover, Dr. Greenberg concluded that the cognitive neurological disabilities and related depression "stemming from his illness and reaction to his cognitive impairments have provided a neurological, neuropsychological, and psychiatric disability." [R. 453].

Dr. Greenberg referred Plaintiff to the Neurobehavioral Institute of New Jersey, P.A., for a neuropsychological evaluation, which was performed on January 10, 2005 and February 10, 2005. [R. 456-67; 913-24]. Plaintiff reported that he had inconsistent seizures (he could have 3-4 in one day, but then would sometimes go 2-3 weeks without having a seizure). [R. 459]. He also reported that he stuttered now but had never stuttered previously. [R. 460]. While he was being evaluated, he became distracted at times and appeared momentarily confused at one point, stating that he just had a seizure but was fine and could continue. [R. 461]. The evaluation revealed impairment in Plaintiff's sensory perception functions in that he made right-sided errors upon bilateral visual stimulation and upon bilateral auditory stimulation, which was consistent with left parietal and temporal brain dysfunction. [R. 803]. Plaintiff demonstrated "difficulty with auditory attention and discrimination for both verbal and nonverbal auditory stimuli." [R. 462]. According to the evaluation, Plaintiff's cognitive deficits were primarily involving verbal material, "which is consistent with a lesion in the left temporal lobe of the language dominant hemisphere." [R. 465]. "Absolute deficits were demonstrated in sustained attention, executive functioning, and complex verbal learning." *Id.*

8

The neuropsychologist found that Plaintiff was "suffering from organic brain syndrome and organic personality syndrome due to a neoplasm in the left temporal lobe."   [R. 466].   In conclusion, she stated that "[m]ultiple MRI scans of the brain have found no new growth in his neoplasm over the past four years, and cognitive performance has generally remained stable, with a very mild increase in symptoms involving auditory perceptual functions in the left hemisphere."   *Id.*   The prognosis was "fair to good for continued stability in cognitive functioning."   *Id.*   Dr. Greenberg concluded that this evaluation showed that there had been further deterioration of Plaintiff's cognitive capabilities since his evaluations in 2000 and 2002. [R. 804].

After this evaluation, Dr. Greenberg opined in a letter to Plaintiff's attorney, dated March 2, 2005, that Plaintiff suffers from a partial simple seizure disorder with autonomic features related to a left mesial temporal lobe low-grade glioma; that Plaintiff's seizures have not decreased in frequency and nature over the past five years; that Plaintiff has developed cognitive neurological impairments that affect his short-term memory, attention-concentration capability, mental processing speed, train of thought in conversation, reading capability, executive functions, and learning capacity; and that it is highly probable that these disabilities will remain as permanent residual neurological, neuropsychological, and psychiatric disabilities in the future. [R. 805].   Dr. Greenberg concluded that Plaintiff was permanently disabled and "unable to perform the essential functions of his current or similar job for at least six consecutive workdays."   *Id.*

Plaintiff was approved for short-term disability benefits by his employer, CIGNA Corporation, on December 23, 2005, and approved for long-term disability benefits on March 23, 2006.   [R. 695-99].   Plaintiff submitted his tax returns for the years 2004-2008, which reflect

the amounts that were paid to him over those years by CIGNA "pursuant to his severance agreement."   [R. 707-77].

On April 7, 2006, Plaintiff reported back to Dr. Robison and had another MRI of his brain performed.   [R. 813].   Dr. Robison stated that there was "[n]o significant change in [Plaintiff's] left medial temporal lobe lesion."   *Id.*   There were no new lesions seen and no abnormality in the brainstem or cerebellum.   *Id.*   Plaintiff continued follow-up visits with Dr. Robison.

Plaintiff completed a Disability Report-Adult, which is undated.   [R. 351-58].   He listed his medical illnesses or injuries as seizures and brain tumors and stated that they drain his energy and affect his thinking.   [R. 352].   Plaintiff stated that he stopped working January 15, 2004 because of his condition.   *Id.*   He also alleged that, because of his condition, he worked fewer hours, changed his job duties, and made changes in his work activity.   *Id.*   Under job history, Plaintiff listed salesman in finance from 1970-2004.   [R. 353].   He described this job as selling life insurance, attending meetings, and traveling to other countries to promote products.   *Id.*   Plaintiff said that, in this job, he had to use machines, tools, and equipment, use technical knowledge or skills, and write and complete reports.   *Id.*   According to Plaintiff, he had to walk or stand for eight hours each day and sit for one hour each day and also had to lift his briefcase and laptop frequently, which weighed about ten pounds.   *Id.*   He stated that he did not supervise other people.   *Id.*   He stated that he was taking Lipitor for his anxiety and Trileptal for his seizures.   [R. 356].

However, in another Work History Report filled out by Plaintiff, dated August 25, 2006, Plaintiff stated that he was responsible for the supervision of 200 employees.   [R. 361].   He also claimed that he did not use machines or tools on the job.   *Id.*

10

Plaintiff filled out a Florida Department of Health form also on August 25, 2006, stating that his disabling condition was a brain tumor, diagnosed in December 2000, which became disabling as of January 14, 2004.   [R. 374].   He stated that he continues to experience seizures and tremors, ear pain, and stabs of pain in his head.   *Id.*   Plaintiff explicitly said that his "pain and seizures come on without warning."   *Id.*   He claimed that his verbal difficulties and stuttering had increased.   *Id.*   Plaintiff estimated that the pain from his seizures lasted anywhere from minutes to hours, but that the seizures are of a shorter duration.   *Id.*   According to Plaintiff, his medication reduced the onset of his seizures but did not stop them.   *Id.*   Plaintiff explained that he could care for himself without assistance and engage in most of the usual activities of daily life, but that he could not perform the functions of his former position because of the onset of pain and seizures without warning.   *Id.*   Attached to this form is a letter dated December 23, 2005, advising Plaintiff that CIGNA approved Plaintiff's claim for short-term disability benefits from January 16, 2004 through July 17, 2004.   [R. 378].   Also attached to the form is a letter dated March 23, 2006, advising Plaintiff that his claim for long-term disability benefits was approved, effective July 17, 2004.   [R. 380].

On October 12, 2006, Plaintiff completed a Function Report-Adult.   [R. 598-605]. Plaintiff alleged that, before his illness, he was able to handle stressful/physical situations better. [R. 599].   He also said that he has frequent seizures while he is sleeping or in bed.   *Id.*   He indicated that he has no problems handling his personal care on his own and does not need any special reminders to take care of his personal needs or grooming.   [R. 599-600].   Plaintiff stated that he makes breakfast and lunch for himself daily.   [R. 600].   He said that he does some painting and light cleaning around the house but has a hired, outside service for most of the household responsibilities.   [R. 600-01].   Plaintiff did not allege that he had any trouble getting

11

around or doing his own shopping.   [R. 601].   He contended that his ability to handle money has changed since his illness began and now he has his accountant review his decisions.   [R. 602].   As for his hobbies and interests, Plaintiff stated that he enjoys television, sightseeing, movies, travel, fishing, and golf, which he said he does whenever possible.   *Id.*   He claimed that since his illness began he is more aware of his body and his mobility when performing these activities.   *Id.*   Plaintiff indicated that he frequently goes to church, social outings, sporting events, and visits family and that he does not need to be reminded to go places.   *Id.*   In the "Information About Abilities" section of the Report, Plaintiff reported that his illness affects his memory, completing tasks, and his concentration because he has "been told that [his] memory and various task[s] have deteriorated."   [R. 603].   He estimated that he can walk approximately two miles without stopping to rest and could not estimate for how long he can pay attention.   *Id.*   When given written instructions, Plaintiff said he "will jump ahead of instructions" and when given spoken instructions, Plaintiff said he follows them "ok."   *Id.*

Plaintiff was referred to Dr. Roger Bash on November 6, 2006, by the Office of Disability Determination for determination of Plaintiff's current clinical condition, mental status, and neuropsychological functioning.   [R. 829-33].   Plaintiff reported feeling happy with his life and "feeling better physically today than he did 5 years ago."   [R. 830].   Plaintiff attributed this to not having the stress of his former job with CIGNA any more.   *Id.*   On the WAIS-IV, Plaintiff had a Full Scale IQ of 102, a Verbal IQ of 102, and a Performance IQ of 100.   [R. 832].   Plaintiff's General Memory standard score on the WMS-II was 82, in the low average range, at the 12th percentile, his Auditory Immediate Memory standard score was 83, in the low average range, at the 13th percentile, and his Visual Immediate Memory standard score was 84, in the low average range, at the 14th percentile.   *Id.*   Further, his Working Memory, a measure

of attention and concentration, was also in the low average range with a standard score of 85, at the 16th percentile. *Id.* Dr. Bash concluded that Plaintiff had "relative decrement in memory capabilities when contrasted with his intellectual capabilities." [R. 833].

On November 15, 2006, James Andriole, D.O., completed a Physical Residual Functional Capacity Assessment. [R. 834-41]. Dr. Andriole found that Plaintiff could occasionally lift and/or carry fifty pounds, could frequently lift and/or carry twenty-five pounds, could stand and/or walk for at least six hours in an eight-hour workday, and could push and/or pull an unlimited amount. [R. 835]. He noted that Plaintiff's seizure history was mixed, sometimes having seizures every few months and sometimes having seizures daily. *Id.* Plaintiff's postural limitations were stated as being able to occasionally climb ramps/stairs, never climb ladders, ropes or scaffolds, and frequently balance, stoop, kneel, crouch, or crawl. [R. 836]. Dr. Andriole indicated that Plaintiff did not have any manipulative limitations, visual limitations, communicative limitations, or environmental limitations, except he should avoid even moderate exposure to hazardous conditions. [R. 837-38]. Dr. Andriole noted that Plaintiff's symptoms appeared partially credible and attributable to a medically determinable impairment that would result in some limitation of his residual function. [R. 839]. He also noted that his findings were not significantly different from the treating source's conclusions on file. [R. 840].

Dr. Sharon Ames-Dennard filled out a Psychiatric Review Technique on November 27, 2006. [R. 842-55]. Dr. Ammes-Dennard found that Plaintiff had a non-severe impairment in the organic mental disorders category, and a co-existing non-mental impairment that required referral to another medical specialty. [R. 842]. According to the doctor, Plaintiff had a cognitive disorder and the data analyses supported a non-severe mental impairment. [R. 843]. For functional limitations under the "B" criteria of the Listings, Dr. Ammes-Dennard found that

13

Plaintiff had mild restrictions of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. [R. 852]. Moreover, the doctor indicated that the evidence did not establish the presence of the "C" criteria. [R. 853].

A consultative examination was performed by Valencia Sanders on November 27, 2006, because the evidence provided by Plaintiff's treating physician did not include sufficient information to assess the level of severity of Plaintiff's symptoms. [R. 606-09]. According to the Worksheet, Plaintiff's treating physician did not wish to perform this consultative examination. [R. 609]. Ms. Sanders found that Plaintiff's symptoms do not interfere with Plaintiff's daily functioning and that Plaintiff's impairments, either singly or in combination, do not impact Plaintiff's physical or mental functional capacity. [R. 606]. Ms. Sanders concluded that Plaintiff had the remaining functional capacity to perform his past relevant work as a salesman as he performed it based on his own description. [R. 607].

On December 11, 2006, Plaintiff saw Dr. Vester again and noted "every six weeks brief spells lasting short periods of time intermittently up to 24 hours of odd tastes and a washed out type feeling." [R. 816]. Dr. Vester reviewed Plaintiff's MRI results showing a stable left medial temporal lesion. *Id.* Dr. Vester suggested that Plaintiff "use an extra 1/2 tablet of Trileptal during some of these periods." *Id.*

Plaintiff filled out an Appeal form on June 13, 2007, alleging that he was more fatigued in his daily activities since the last disability report that he completed. [R. 614]. He also stated that his brain tumor remained the same size, and he had not had improvement in his condition. [R. 615].

Dr. Catherine Nunez performed a Psychiatric Review Technique on October 23, 2007

14

and concluded that Plaintiff had a non-severe medical impairment in the organic mental disorders category. [R. 878]. According to Dr. Nunez, Plaintiff had the following functional limitations under the "B" criteria of the Listings: no restrictions of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. [R. 888]. Further, Dr. Nunez found that Plaintiff's evidence did not establish the presence of the "C" criteria of the Listings. [R. 889]. In summary, Dr. Nunez stated that Plaintiff's memory was "mildly impaired compared to intellectual functioning, but he continues to be able to function in the average range on all necessary tasks from a mental standpoint." [R. 890]. There was no evidence of significant mental restrictions. *Id.*

On November 2, 2007, Robert Whittier performed a Physical Residual Functional Capacity Assessment. [R. 895-902]. Mr. Whittier found that Plaintiff could occasionally lift and/or carry 100 pounds or more, could frequently lift and/or carry fifty pounds or more, could stand and/or walk for at least six hours in an eight-hour workday, could sit for at least six hours in an eight-hour workday, and could push and/or pull an unlimited amount. [R. 896]. He noted that Plaintiff had seizures approximately 8-10 times a year. *Id.* Plaintiff's postural limitations were stated as being able to frequently climb ramps/stairs, occasionally climb ladders, ropes or scaffolds, and frequently balance, stoop, kneel, crouch, or crawl. [R. 897]. Mr. Whittier indicated that Plaintiff did not have any manipulative limitations, visual limitations, communicative limitations, or environmental limitations, except he should avoid even moderate exposure to hazardous conditions. [R. 899].

In a Disability Report-Appeal, completed on January 8, 2008, Plaintiff reported that the frequency of his seizures had increased, in November of 2007 or prior, since his last disability

report. [R. 646]. He stated that his daily activities "continue to be limited by [his] disabling brain tumor and related seizures as described in the medical information and other information provided in support of [his] claim." [R. 649].

Plaintiff reported to Dr. Joseph Tracy on July 3, 2008, for a Neuropsychological Evaluation. [R. 1035-47]. Plaintiff was referred to Dr. Tracy to determine his current levels of adaptive functioning and behavior and to assess his neurocognitive strengths and weaknesses. [R. 1035]. Dr. Tracy concluded that Plaintiff was malingering and that it was highly likely that the objective data did not reflect Plaintiff's true underlying capacities because, during the testing, Plaintiff's efforts "wavered and performance was suboptimal." [R. 1046]. Therefore, Dr. Tracy stated that he could not "confirm nor preclude the presence of a Neurocognitive Disorder." *Id.* Dr. Daniel Benincasa reviewed Dr. Tracy's evaluation and concluded that Plaintiff did not have a cognitive impairment or any substantial psychiatric conditions that would preclude him from working in his occupation or any occupation. [R. 1050].

On September 24, 2008, CIGNA sent Plaintiff a letter notifying him that they were terminating his long-term disability benefits. [R. 1022-27]. According to the letter, Plaintiff's diagnosis and restrictions from doctors were conflicting. [R. 1024]. CIGNA therefore scheduled neuropsychiatric testing for Plaintiff at their expense. *Id.* CIGNA sent the report and summary to an independent neuropsychologist and forensic examiner who concluded that Plaintiff had no cognitive impairment or any substantial psychiatric conditions that would preclude Plaintiff from working in his occupation or any occupation. [R. 1025-26].

On January 8, 2010, Dr. Greenberg wrote a letter to Plaintiff and his attorney comparing his past neuropsychological reports from 2005 to the neuropsychological evaluation performed by Dr. Bash on November 6, 2006. [R. 905]. Dr. Greenberg opined that Plaintiff continued to

suffer from memory impairment, which was now more severe than during his evaluations in 2005. *Id.* Dr. Greenberg concluded that he still maintained that cognitive disabilities "prevent [Plaintiff] from performing [his] previous work activity or from any other type of work activity." [R. 906].

On January 12, 2010, Dr. Vester wrote a letter to Plaintiff's attorney advising him that since January of 2004 Plaintiff had been experiencing an average of 4-6 seizures per month, which can occur up to 2-4 times per day. [R. 958]. Dr. Vester also noted that Plaintiff could go without seizure for 2-3 weeks at a time. *Id.*

Dr. Robison submitted a letter to Plaintiff's attorney on January 13, 2010, indicating that Plaintiff has been having seizures approximately 4-6 times per month in spite of treating with anti-seizure medication. [R. 959]. Dr. Robison stated that Plaintiff was not recommended for surgery because his lesion was not changing in size. *Id.*

### C. Initial ALJ Decision

The ALJ issued his initial decision on Plaintiff's claim for benefits on March 23, 2010. [R. 125-45]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 128-29]. He found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and had not engaged in substantial gainful activity since January 15, 2004, the alleged on-set date, although Plaintiff's earnings records showed that he had earnings in 2004 and 2005. [R. 130]. The ALJ then found that Plaintiff suffers from the following severe impairments: a benign brain tumor and petit seizure disorder. *Id.* The ALJ explicitly stated that these impairments "result in limitations that significantly affect [Plaintiff's] ability to perform basic work activities." *Id.* He further found that Plaintiff had been diagnosed with a mild cognitive disorder but stated that

impairment did not result in limitation that would significantly affect Plaintiff's ability to perform basic work activities and is considered non-severe.  *Id.*

The ALJ next found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CRF Part 404, Subpart P, Appendix 1.  [R. 131].  The ALJ noted that "State Agency psychologists and doctors have found that [Plaintiff's] impairments do not meet or medically equal any impairment in the Commissioner's Listing of Impairments."  *Id.*

The ALJ then completed a residual functional capacity ("RFC") assessment and found that Plaintiff had the residual functional capacity to perform "medium work as defined in 20 CFR 404.1567(c) except that he may never be required to climb ladders, ropes, or scaffolds as part of his job.  He may only occasionally be required to climb ramps or stairs.  He may frequently be required to change positions that require balancing, stooping, kneeling, crouching, or crawling."  *Id.*  The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence.  *Id.*

The ALJ then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions.  *Id.*  He summarized the testimony of Plaintiff and Plaintiff's wife at the hearing.  [R. 131-33].  The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they

18

are inconsistent with the above residual functional capacity assessment." [R. 133]. The ALJ then went through the various medical records in detail. [R. 133-40]. He further found that there is evidence that Plaintiff "has misrepresented facts relevant to the issue of disability" and "the evidence strongly suggests [Plaintiff] would have continued working despite his impairment if his company had not downsized and eliminated his job." [R. 133-34].

In terms of the opinion evidence, the ALJ explained that the opinions of Plaintiff's treating physicians, Dr. Robison, Dr. Vester, and Dr. Greenberg, were given little weight because the medical evidence does not support their opinions. [R. 134-35]. The ALJ placed considerable weight on the reports and opinions of Dr. Sharon Ames-Dennard and Dr. Catherine Nunez, the non-examining psychologists. [R. 138]. The ALJ also placed considerable weight in the opinions of two non-examining physicians, Dr. James Andriole and Dr. Robert Whittier, because their opinions were supported by the medical evidence and other reports concerning Plaintiff's physical health. [R. 139]. The ALJ also noted that no treating doctor recommended restrictions placed on Plaintiff. *Id.*

The ALJ next found that Plaintiff was able to perform past relevant work as a corporate vice president because the work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity. [R. 140]. He stated that Plaintiff could participate in highly skilled, light exertional activity. *Id.* The ALJ found that Plaintiff was able to perform medium work with some limitations as actually and generally performed. *Id.* Finally, he found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from January 15, 2004, through the date of this decision." *Id.*

### D. Appeals Council Decision

Plaintiff filed an appeal with the Appeals Council. The Appeals Council issued an

19

Order remanding the case back to the ALJ on September 9, 2011.   [R. 146].   According to the Appeals Council, the review was granted under the substantial evidence, error of law, and new and material evidence provisions of the Social Security Administration regulations.   [R. 147]. On remand, the ALJ was instructed to further evaluate Plaintiff's earnings during the period at issue and determine whether Plaintiff engaged in substantial gainful activity since the alleged onset date, to receive updated evidence on Plaintiff's medical condition, to further evaluate Plaintiff's mental impairment, and, if warranted by the expanded record, to obtain evidence from a vocational expert to clarify the demands of Plaintiff's past relevant work and/or the effect of the assessed limitations on Plaintiff's occupational base.   [R. 148].

### E.  Hearing Testimony on Remand

On remand, the ALJ held a video hearing on March 6, 2013.   [R. 80].   Upon inquiry from the ALJ, Plaintiff testified that the reported earnings on his earning record during years that occurred after his alleged onset date were attributable to prior deferred income from investments that his company owed him.   [R. 81-82].   According to Plaintiff, these earnings were part of his severance package when he left his former company.   [R. 82].   Plaintiff stated that he has a driver's license, which was issued on April 4, 2011 and has a restriction on his license for corrective lenses.   [R. 83].   Plaintiff testified that his most recent brain MRI was in 2012, ordered by Dr. Pao, and that he recently had an EEG, ordered by Dr. La Kier.   [R. 84].   He stated that Dr. Pao is his neurologist here in Florida and he sees her every 6-9 months.   *Id.*

Then, Plaintiff's attorney questioned him.   [R. 85].   Plaintiff testified that, just in the last two years, when his seizures occur, he is not able to communicate what he is thinking about. *Id.*   He stated that his neurologist has not ordered him to stop driving because when he has a seizure he can feel it coming on for an extended period of time.   *Id.*   Plaintiff explained that,

20

before a seizure, he feels an aura throughout his body that enables him to take whatever precautions he needs to take before the seizure occurs.   [R. 86].   He stated that he feels the aura for approximately 20-45 seconds before the seizure occurs so if he is driving he can pull over to the side of the road.   *Id.*   He also stated that it takes him anywhere from fifteen to thirty minutes to recover from a seizure.   [R. 87].

According to Plaintiff, his seizures occur approximately six times a week, and he said that they occur "in clumps," such that if he has one on a Tuesday it will usually also happen on Wednesday as well.   [R. 88].   Plaintiff stated that he is taking Oxcardaepine twice a day for his seizures and is not taking any medication for his brain tumor.   [R. 89].   He stated that his medication makes him tired and gives him aches and pains.   [R. 90].

Further, Plaintiff's attorney inquired about his daily activities.   [R. 91].   Plaintiff testified that he tries to help his wife with the household chores, but "[t]here's really not much to do."   *Id.*   He stated that his wife handles the finances for the household because she is much more organized than him.   *Id.*   Plaintiff said that he really does not do any lifting at home besides taking groceries in the house, which he approximated to be about five pounds.   [R. 92].   He explained that lifting any more than that causes him muscle fatigue and soreness.   [R. 93].

According to Plaintiff, his job at CIGNA allowed him to reduce his stress level and take off whatever time he needed for his well-being because his performance "was exemplary" and his team was "always recognized as best of class of all the service functions in the corporation." [R. 94].   He said that because they were a healthcare company, they were concerned for his health.   *Id.*   At that point in time, Plaintiff had been working for the company since approximately 1990 or 1991, and his title was senior vice president of global real estate services. [R. 95].   He testified that his compensation the last year that he worked was approximately $1

million.  *Id.*   Plaintiff stated that if it were not for his ailments he would have stayed at his company because he enjoyed working for CIGNA.   [R. 96].

The ALJ inquired about Plaintiff's short-term and long-term disability benefits.   [R. 97]. Plaintiff had testified earlier in the hearing that he did not receive any long-term or short-term disability benefits.   [R. 82].   Plaintiff clarified that it was agreed upon between him and CIGNA that if he could demonstrate that he was under the classification of being disabled that they would put that in his separation agreement.   [R. 98].   Moreover, Plaintiff stated that there was some sort of settlement reached regarding long-term and short-term disability benefits.   *Id.* Finally, Plaintiff testified that since 2010 he had no overnight hospitalization or emergency room treatment.   [R. 101].

Next, Ruth Harback, a vocational expert testified.   [R. 101].   Ms. Harback stated that she derives her vocational information to prepare for hearings from the claimant's work history, the claimant's testimony, and occupational employment statistics, uses a skill methodology, and looks at county business patterns and Bureau of Labor statistics.   [R. 103-04].

She classified Plaintiff's job as a senior vice president for global services at an SVP[2] level of 8, being highly skilled and light in strength.   [R. 105].   She explained that Plaintiff has many skills, such as administrating, sales, record keeping, real estate, and finance.   [R. 107]. According to the vocational expert, Plaintiff could transfer these skills to a semi-skilled job, such as a clerk.   *Id.*   The ALJ posed the vocational expert the first hypothetical in which an individual was 66 years of age and was limited to frequently lifting or carrying twenty-five pounds and occasionally lifting or carrying fifty pounds; could sit, stand or walk for six hours in

---

[2] SVP is Specific Vocational Preparation, which is the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   20 C.F.R. § 656.3.

an eight hour day; had the unlimited ability to push or pull; could occasionally climb ramps and stairs but should never climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could frequently balance, stoop, crouch, kneel or crawl; and should avoid even moderate exposure to unprotected heights and hazardous machinery but may operate an automobile.   [R. 107-08].   Given those facts, the expert found that the individual could perform his past relevant work.   [R. 109].

Then, Plaintiff's attorney posed a different hypothetical in which an individual could do everything listed in the first hypothetical, except he had a marked deficiency in carrying out complex instructions, in his ability to make judgments on complex work-related decisions, and in understanding and remembering complex instructions.   [R. 110].   The expert responded that such an individual would not be able to perform his past relevant work.   *Id.*   The attorney then posed a third hypothetical in which an individual could do everything listed in the second hypothetical, except he was limited physically to the full range of light work, and asked if that individual would transfer any skills to a light level of work.   *Id.*   The vocational expert stated that he would not have any acquired skills that could be transferred to the light level of work. *Id.*

Ms. Harback explained that at the semi-skilled and sedentary levels Plaintiff would not be doing complex work so he could transfer to a semi-skilled position, such as a clerk, where the work is no longer complex.   *Id.*   She clarified that Plaintiff has acquired skills that could be transferred to jobs at the sedentary level, such as his data entry skills, administrative skills, and record keeping skills.   [R. 112-14].

The attorney posed another hypothetical to the vocational expert in which an individual could do everything listed in the third hypothetical, except he had 25-30 seizures a month.   [R.

116]. The vocational expert responded that the individual would not be able to perform a medium job and be at unprotected heights. *Id.* She stated that an individual having 25-30 seizures a month would not be able to maintain employment or be productive in any job. [R. 117].

Finally, the ALJ asked Plaintiff's counsel for all of Plaintiff's medical records, particularly since 2010, from Dr. Pao, Dr. La Kier, and Dr. Vester. [R. 118].

### F. Medical Record Evidence Submitted on Remand

Plaintiff reported to Dr. Linda Pao, a neurologist, from December 27, 2011 through March 15, 2013, for monitoring of his brain tumor. [R. 1561-90]. Plaintiff reported to Dr. Pao that his episodes were occurring 1-2 times per month. [R. 1577]. Dr. Pao noted that Plaintiff could switch medications or add Klonopin to help control his seizures. [R. 1580]. After Dr. Pao reviewed an MRI of Plaintiff's brain, she found that Plaintiff's tumor was a stable left mesial temporal neoplasm, possibly low grade glioma. [R. 1576]. In July of 2012, Plaintiff reported to Dr. Pao that his seizures had increased in the past six months, which Dr. Pao attributed to Plaintiff missing his dose and handling the stress of his father's illness. [R. 1569-72]. In February of 2013 Plaintiff reported having seizures two times per month and being fatigued in the afternoon. [R. 1562].

A clinical psychologist, Dr. Seth Leventhal, performed a Psychological Evaluation of Plaintiff on June, 19, 2012, after Plaintiff was referred to him by the Florida Department of Health Office of Disability Determinations. [R. 1526-30]. Plaintiff reported that he had significant impairment with regard to his memory functioning and he relies upon his wife to "write frequent notes and reminders of the day's activities and appointments." [R. 1527]. Plaintiff stated that he was recently appointed as executor of his father's estate, which has been

24

stressful for him, but he claimed he was able to manage those responsibilities.   [R. 1526].   Dr. Leventhal noted that Plaintiff appeared to exert "his best effort" during the examination, but stated that Plaintiff appeared depressed and was mood congruent.   [R. 1527].   After performing the Wechsler Memory Scale Test, Dr. Leventhal stated that Plaintiff "achieved scores which were slightly to significantly below age expectations."   [R. 1529].   Plaintiff "demonstrated impairment in overall immediate memory functioning," but his performance tended to improve with auditory cuing.   *Id.*   Dr. Leventhal noted that Plaintiff' scores were below what would be predicted based upon Plaintiff's IQ scores, indicating a cognitive impairment.   *Id.*

On June 21, 2012, after the Evaluation, Dr. Leventhal filled out a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Plaintiff.   [R. 1523-25].   Dr. Leventhal indicated that Plaintiff's ability to understand, remember and carry out instructions is affected by the impairment in the following ways: it mildly affects his ability to understand and remember simple instructions, mildly affects his ability to carry out simple instructions, mildly affects his ability to make judgments on simple work-related decisions, markedly affects his ability to understand complex instructions, markedly affects his ability to carry out complex instructions, and markedly affects his ability to make judgments on complex work-related decisions.   [R. 1523].   Dr. Leventhal noted that Plaintiff "shows signs of impaired recent memory."   *Id.*   Plaintiff reportedly had no problems interacting appropriately with the public, with supervisors, or with co-workers.   [R. 1524].   Dr. Leventhal did not list any other capabilities that were affected by Plaintiff's impairment.   *Id.*

Plaintiff reported to Dr. Earl La Kier from June 26, 2012 through February 28, 2013, for chest pain, dyslipidemia, myalgia, and fatigue/weakness.   [R. 1546-60].

Dr. Steven Kanner performed an examination of Plaintiff and filled out a Medical Source Statement of Ability to do Work-Related Activities (Physical) on July 17, 2012.   [R. 1532-1542].   Plaintiff reported that he experiences on average 25-30 seizures a month, sometimes going days without having a seizure and sometimes having multiple seizures in a day. [R. 1532].   Plaintiff explained that while he is having a seizure he cannot talk and his brain does not function.   *Id.*   Dr. Kanner stated that Plaintiff could sit, stand, walk, lift, carry, and handle objects without difficulty.   [R. 1535].   Dr. Kanner estimated that Plaintiff could continuously lift/carry up to twenty pounds, frequently lift/carry 21-50 pounds, and occasionally lift/carry 51-100 pounds.   [R. 1536].   Dr. Kanner noted that it was a normal exam.   *Id.*   Further, Dr. Kanner found that Plaintiff could sit and stand for four hours without interruption and could walk for five hours without interruption.   [R. 1537].   According to Dr. Kanner, Plaintiff could sit, stand, and walk for eight hours in an eight-hour workday.   *Id.*   Plaintiff had no limitations in regard to use of his hands, use of his feet, postural activities, environmental limitations, or daily activities.   [R. 1538-41].

On March 15, 2013, Dr. Pao gave a sworn statement on Plaintiff's disability.   [R. 1582-90].   Dr. Pao stated that Plaintiff suffered from "simple partial epilepsy and a mesial temporal lobe tumor."   [R. 1586].   She described Plaintiff's seizures as "a sensory sensation followed by loss of language."   [R. 1587].   Dr. Pao determined that Plaintiff could occasionally lift ten pounds.   *Id.*   She noted that his fatigue could be a side effect of the medications that he takes.   [R. 1588].   Finally, Dr. Pao stated that Plaintiff's prognosis for recovery was poor because his clinical status has not changed since 1999, and the prognosis was guarded for the low grade glioma because it may change in size.   [R. 1588-89].

## G. ALJ Decision On Remand

On remand, the ALJ issued his decision on Plaintiff's claim for benefits on September 25, 2013.   [R. 16-36].   The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled.   [R. 20-21].   He found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and had not engaged in substantial gainful activity since January 15, 2004, the alleged on-set date, through his date last insured, December 31, 2010.   [R. 21].   The ALJ explained that the amounts in 2004, 2005, and 2008 on Plaintiff's earnings records that appeared to be earnings were "deferred compensation and monies received in connection with [Plaintiff's] severance package."   *Id.* The ALJ then found that Plaintiff suffers from the following severe impairments: benign brain tumor and simple partial seizures.   *Id.*   He went through the extensive medical record and summarized Plaintiff's impairment.   [R. 21-23].   The ALJ explicitly stated that Plaintiff's mental impairment "did not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and was therefore nonsevere."   [R. 24].

The ALJ next found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CRF Part 404, Subpart P, Appendix 1.   [R. 25].

The ALJ then completed a residual functional capacity ("RFC") assessment and found that Plaintiff has the residual functional capacity to "lift and carry twenty-five pounds frequently and fifty pounds occasionally.   [Plaintiff] can stand or walk for six hours in an eight-hour day. [Plaintiff] can sit for six hours in an eight-hour day.   [Plaintiff's] ability to push and pull is not limited beyond his capacity to lift and carry.   [Plaintiff] may only occasionally climb ramps and stairs and may never climb ladders, ropes or scaffolds.   [Plaintiff] may frequently balance,

stoop, kneel, crouch, or crawl.  [Plaintiff] must avoid even moderate exposure to unprotected heights or hazardous machinery.  [Plaintiff] can operate an automobile with no restrictions and has no other environmental restrictions." *Id.*  The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. *Id.*

The ALJ then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. [R. 25-28].  He went through a detailed review of Plaintiff's hearing testimony and Plaintiff's wife's hearing testimony.  [R. 25-27].  The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the degree alleged for the reasons explained in this decision."  [R. 27].  The ALJ went through the various medical records in detail.  [R. 27-28]. He found that Plaintiff's "seizure disorder is not as limiting as is alleged."  [R. 27].

In terms of the opinion evidence, the ALJ gave the opinions of the state agency physical examiners significant weight because their opinions were "most consistent with the medical record as a whole."  [R. 28].  As for Dr. Greenberg and Dr. Robison's opinions, the ALJ gave them little weight because they were not "experts on vocational requirements nor does the totality of the record suggest that [Plaintiff] becomes incapacitated by his seizure activity."  *Id.*

Further, the ALJ gave Dr. Pao's opinion[3] little weight as it was not supported by substantial evidence in the record.  *Id.*

The ALJ next stated that the vocational expert testified that Plaintiff could perform his past relevant work as a Senior Vice President for Global Services when asked if a hypothetical individual having the residual functional capacity that the ALJ found would be capable of performing this job as generally performed.  *Id.*  The ALJ concluded that "in comparing [Plaintiff's] residual functional capacity with the physical and mental demands of this work," Plaintiff was able to perform this work as generally performed.  *Id.*  Finally, he found that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from January 15, 2004, through December 31, 2010, the date last insured."  *Id.*

Plaintiff appealed this decision to the Appeals Council, but that appeal was denied.  [R. 1-6].

## II.   **MOTIONS FOR SUMMARY JUDGMENT**

In his Motion for Summary Judgment with Supporting Memorandum of Law, Plaintiff makes four arguments.  [DE 20].  First, he argues that the ALJ erred by failing to properly assess Plaintiff's cognitive impairment and its impact on his residual functional capacity.  [DE 20, p. 14].  Second, Plaintiff asserts that the ALJ erred by rejecting the opinions of Dr. Greenberg, Dr. Robison, and Dr. Pao, who were Plaintiff's treating physicians.  [DE 20, p. 20].  Third, Plaintiff contends that the ALJ erred by relying on a defective evaluation of Plaintiff's subjective complaints and credibility.  [DE 20, p. 24].  Fourth, he claims that the ALJ erred by failing to meaningfully address the lay evidence of record.  [DE 20, p. 27].

---

[3]  The treatment records refer to this treating source interchangeably as Dr. Linda Poe and Dr. Linda Pao.   For consistency, the Court will use Dr. "Pao" throughout this opinion.

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment, she argues that substantial evidence supports the ALJ's finding that Plaintiff could perform his past relevant work and was not disabled. [DE 24, p. 5]. Defendant points out, as an initial matter, that Plaintiff did not show that he was disabled prior to the expiration of his disability insured status, which expired on December 31, 2010. [DE 24, p. 5]. Specifically, Defendant maintains that substantial evidence supported the ALJ's finding that Plaintiff's impairments did not cause additional limitations, that the ALJ properly considered the medical source opinions in assessing Plaintiff's residual functional capacity, and that the ALJ properly considered Plaintiff's credibility and allegations of disabling symptoms. [DE 24, pp. 5-15].

### III.   LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F. 2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F. 2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F. 2d 1520, 1529 (11th Cir.

1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability.   20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f).   The ALJ must first determine whether the claimant is presently employed.   If so, a finding of non-disability is made, and the inquiry concludes.   20 C.F.R. § 404.1520(b).   In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments.   If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends.   20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments.   20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work.   *See Gibson v. Heckler*, 762 F. 2d 1516, 1518, n. 1 (11th Cir. 1985).   If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded.   20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work.   If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established.   20 C.F.R. § 404.1520(e).   The burden then shifts to the ALJ to show at step five that, despite the claimant's

impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience.  20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239.  In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert.  *See Phillips*, 357 F. 3d at 1239-40.

The Eleventh Circuit has established a three part "pain standard" to be utilized by the ALJ when a claimant tries to "establish disability through his or her own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991).  The standard requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  *Id.*  Moreover, "[t]he claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability."  *Id.*  The ALJ must specifically explain why he or she is deciding to discredit such testimony, and "[f]ailure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true."  *Id.*

A.  Whether the ALJ erroneously concluded that Plaintiff's cognitive impairment was non-severe and failed to properly assess its impact on his residual functional capacity

An ALJ is required at step two of 20 C.F.R. § 404.1520 to determine whether the claimant's impairment is severe or not severe.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild.  An impairment is not severe only if the abnormality is so slight and its effect so

32

minimal that it would clearly not be expected to interfere with the individual's ability to work . . .

." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).   The Eleventh Circuit Court of Appeals has further explained that, "if no severe impairment is shown [at step two] the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Brown*, 814 F.2d 585, 588 (11th Cir. 1987).   As the ALJ continues to steps three, four, and five of the required analysis, the ALJ "is to consider the claimant's entire medical condition, including any impairment or combination of impairments, whether severe or not." *Childers v. Social Sec. Admin., Comm'r*, 521 Fed. Appx. 809, 811 (11th Cir. 1013) (citing *Jamison*, 814 F.2d at 588).

Plaintiff claims that the ALJ erroneously concluded that Plaintiff's cognitive impairment was non-severe and then failed to properly assess its impact on Plaintiff's residual functional capacity.   [DE 20, p. 14].   Plaintiff also claims that it was error for the ALJ to not include any mental restrictions in his RFC formulation, including in the context of complex instructions, concentration, pace, or persistence, because Plaintiff's past work required significant mental demands.   [DE 20, pp. 15, 20].   Plaintiff also contends that the ALJ failed to properly discuss and assign a weight to the consultative examination report done by Dr. Leventhal.   [DE 20, p. 16].   Further, he alleges that the ALJ "should have considered the significance of [Plaintiff's] decline in cognitive functioning as revealed by his decreasing IQ scores."   [DE 20, p. 17].

Defendant asserts that the ALJ found that, although Plaintiff had severe impairments of benign brain tumors and simple partial seizures, Plaintiff did not have a severe mental impairment, which was supported by substantial evidence.   [DE 24, pp. 5-6].   According to Defendant, Plaintiff failed to prove that his impairments, whether severe or not, caused

33

additional limitations on his ability to work, precluding him from performing medium work with certain limitations.   [DE 24, p. 6].   Finally, Defendant claims that Plaintiff failed to prove that he had a severe mental impairment and that the ALJ's ratings of Plaintiff's functional areas of the paragraph B criteria all equated with a non-severe mental impairment.   [DE 24, p. 7]. Defendant maintains that the record supports the ALJ's ratings and his determination that Plaintiff did not have a severe mental impairment.   *Id.*

At step two of the required analysis, the ALJ found that Plaintiff suffers from the following severe impairments: benign brain tumor and simple partial seizures.   [R. 21].   At step three of the required analysis, the ALJ explicitly stated that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."   [R. 25].   At step four, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these statements are not entirely credible..."   [R. 27].

The ALJ went through the various medical records in detail.   [R. 21-23].   The ALJ specifically explained in his decision that Plaintiff was evaluated in March 2005 by Dr. Greenberg and received treatment over the course of several years from Dr. Vester.   [R. 21]. The ALJ described Plaintiff's "dizzy spells" and symptoms.   [R. 22].   He noted Plaintiff's MRI results from 2002, 2003, and 2006, which showed no significant change or growth of Plaintiff's tumor.   *Id.*   The ALJ then noted that Plaintiff saw Dr. Bash in November 2006 for a consultative psychological examination and Dr. Bash diagnosed Plaintiff with a cognitive disorder, and that Plaintiff saw Dr. Marcus in October 2007, reporting only 8-10 seizures a year

and that his condition was largely controlled with medication.   *Id.*   The ALJ further discussed Dr. Greenberg's updated assessment from January 2010, Dr. Leventhal's consultative psychological examination of Plaintiff from June 2012, and Dr. Kanner's physical examination from July 2012.   [R. 23].   Finally, the ALJ summarized Dr. Pao's treatment notes of Plaintiff and stated that Dr. Pao diagnosed Plaintiff with simple partial seizures and restarted him on medications.   *Id.*

The ALJ concluded that that Plaintiff's "medically determinable mental impairment of cognitive impairment did not cause more than minimal limitation in [Plaintiff's] ability to perform basic work activities and was therefore non-severe."   [R. 24].   He stated that he "considered the four broad functional areas set out in the disability regulations for evaluating mental disorders," known as the paragraph "B" criteria.   *Id.*   The ALJ determined that Plaintiff has mild limitation in activities of daily living, mild limitation in social functioning, mild limitation in concentration, persistence, or pace, and no episodes of decompensation which have been of extended duration.   *Id.*   Therefore, the ALJ concluded that Plaintiff's medically determinable mental impairment was non-severe pursuant to 20 CFR § 404.1520a(d)(1).

Moreover, Plaintiff alleged at the hearing that he stopped working because of his seizures and inability to perform the responsibilities of his job at the same level.   [R. 45].   However, Plaintiff stated in a previous affidavit that he was "identified by the company as part of its downsizing process."   [R. 399].   This was confirmed by Dr. Vester's treatment records noting that Plaintiff was terminated from CIGNA.   [R. 417].

After the ALJ found that Plaintiff's mental impairment was non-severe, in conducting the RFC, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other

evidence." [R. 25]. Further, the ALJ discussed Plaintiff's allegations of his mental impairment in his RFC assessment. [R. 27]. The ALJ articulated his reasons for discounting these allegations when he stated that "recent testing showed [Plaintiff] to retain mental functioning in the average to low average ranges predominantly and [Plaintiff] was only recently appointed the Executor of his father's estate, a position requiring both judgment and significant cognition." *Id.* Therefore, the ALJ did properly assess the impact of Plaintiff's mental impairment on his residual functional capacity.

The Court first finds that the ALJ clearly considered Plaintiff's entire medical condition in the aggregate in evaluating Plaintiff's RFC and the credibility of Plaintiff's subjective claims. The Court next finds that substantial evidence supports the ALJ's finding that there is insufficient evidence in the record to show Plaintiff's mental impairment was severe.

B. <u>Whether the ALJ improperly rejected the opinions of Plaintiff's treating physicians</u>

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F. 3d at 1440. "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*

Plaintiff contends the ALJ erred in giving "little weight" to the opinions of Dr. Greenberg, Dr. Robison, and Dr. Pao, and giving significant weight to the "outdated opinions of non-examining sources, whom the ALJ erroneously claimed were examiners." [DE 20, p. 20]. He claims that the ALJ's evaluation and weighing of the treating physicians' opinions was

36

inadequate and cannot be properly sustained. *Id.* As for Dr. Pao, Plaintiff asserts that the ALJ did not address the entirety of Dr. Pao's opinions or provide sufficient reasoning for rejecting them. [DE 20, p. 22]. He also asserts that the ALJ's generic finding that Dr. Pao's opinion was not supported by substantial evidence in the record was insufficient to support the rejection of a treating physician's opinion. *Id.* As for Dr. Greenberg and Dr. Robison, Plaintiff alleges that the ALJ only addressed a fraction of their opinions and "unfairly 'cherry pick[ed]' from the record." [DE 20, p. 23].

Defendant first asserts that the ALJ "properly considered the records and opinions of the doctors who treated Plaintiff, examined Plaintiff, and reviewed the record in determining Plaintiff had the RFC for a range of medium work." [DE 24, p. 8]. She further asserts that, although treating physicians' opinions about what a Plaintiff can or cannot do are relevant evidence, their opinions are not determinative because the ALJ completes his or her own RFC assessment. [DE 24, p. 9]. Defendant explains that treating physicians' opinions on issues that are reserved to the Commissioner, such as whether the claimant is unable to work or is disabled, "are not entitled to controlling weight or special significance." *Id.* According to Defendant, the ALJ provided good reasons for giving little weight to the opinions of Dr. Greenberg and Dr. Robison. *Id.* Further, Defendant asserts that Dr. Pao's treatment records do not include objective medical findings to support her opinion. [DE 24, p. 10]. Defendant next contends that the opinions of Dr. Greenberg, Dr. Robison, and Dr. Pao are inconsistent with the record as a whole, which the ALJ stated. *Id.* Defendant alleges that the opinions of Dr. Marcus and Dr. Andriole undermine the opinions of Plaintiff's treating physicians and are consistent with the record. [DE 24, pp. 10-11]. Finally, Defendant claims that the medical evidence dated even after Plaintiff's date last insured supports the ALJ's findings. [DE 24, p.

11].

### 1. Dr. Greenberg and Dr. Robison

As Dr. Greenberg and Dr. Robison were two of Plaintiff's treating physicians, their opinions and evaluations should have been accorded considerable weight unless the ALJ had good cause for disregarding them and clearly articulated his reasons for disregarding them.   The Court finds that the ALJ had good cause to not give Plaintiff's treating physician's opinions substantial or considerable weight and he adequately articulated his reasons for disregarding their opinions.   First, the ALJ explicitly discussed their opinions and stated that he gave Dr. Greenberg and Dr. Robison's opinions little weight because they were not "experts on vocational requirements nor [did] the totality of the record suggest that [Plaintiff] becomes incapacitated by his seizure activity."   [R. 22, 23, 28].

Dr. Robison treated as Plaintiff's primary care physician beginning in 2000.   Plaintiff reported to Dr. Robison after MRIs of his brain every 6-9 months since November 8, 2000, which showed that Plaintiff's tumor was benign and not changing in size.   Dr. Robison submitted a letter to Plaintiff's attorney on January 13, 2010, indicating that Plaintiff has been having seizures approximately 4-6 times per month in spite of treating with anti-seizure medication.   [R. 959].   However, Dr. Robison's treatment notes reflect that Plaintiff's seizures were controlled by medication at times and that his brain lesion was unchanged.   [R. 423, 809-15, 862-77].

Moreover, Dr. Greenberg performed 3-day testing on Plaintiff in late 2004.   [R. 52]. Since then, it does not appear that Dr. Greenberg actually saw Plaintiff aside from reviewing the findings of other doctors that saw Plaintiff.   Although Dr. Greenberg opined that Plaintiff's seizures were not controlled and that Plaintiff was unable to return to work, the ALJ cited to

specific treatment notes showing that Plaintiff reported less frequent seizures and that the seizures were only worse when Plaintiff missed his medication.   [R. 23, 797-808].   The record evidence supports this finding.   [R. 419, 374].

Plaintiff claims that the ALJ erred in relying on "outdated" opinions from non-examining medical providers.   As the ALJ discussed, in November of 2006 and October of 2007, Plaintiff was examined by Dr. Alan Marcus and he noted that Plaintiff had about 8-10 seizures a year, which were mostly controlled with medication.   [R. 894].   Further, the ALJ concluded that "[t]he opinions of the state agency physical examiners finding [Plaintiff] capable of a range of medium work and state agency psychological examiners finding [Plaintiff's] mental impairments to be non-severe are given significant weight as these opinions are most consistent with the medical record as a whole."   [R. 28].   In making this finding, the ALJ cited to the opinions of Dr. James Andriole, Dr. Sharon Ames-Dennard, and Dr. Catherine Nunez.   *Id.*   Dr. Andriole noted that Plaintiff's seizure history was mixed, sometimes having seizures every few months and sometimes having seizures daily.   [R. 835].   He concluded that Plaintiff could perform medium work.   [R. 834-41].   Dr. Sharon Ames-Dennard filled out a Psychiatric Review Technique on November 27, 2006, and found that Plaintiff had a non-severe impairment in the organic mental disorders category.   [R. 842-55].   For functional limitations under the "B" criteria of the Listings, Dr. Ammes-Dennard found that Plaintiff had mild restrictions of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. [R. 852].   It is worth noting that the ALJ, in his decision, found further limitations of Plaintiff than Dr. Ammes-Dennard when he found that, under the "B" criteria of the Listings, Plaintiff had mild restrictions of daily living, mild difficulties in maintaining social functioning, mild

difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration.   [R. 24].

Dr. Catherine Nunez performed a Psychiatric Review Technique on October 23, 2007 and also concluded that Plaintiff had a non-severe medical impairment in the organic mental disorders category.   [R. 878].   According to Dr. Nunez, Plaintiff had the following functional limitations under the "B" criteria of the Listings: no restrictions of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration.   [R. 888].   In summary, Dr. Nunez stated that Plaintiff's memory was "mildly impaired compared to intellectual functioning, but he continues to be able to function in the average range on all necessary tasks from a mental standpoint."   [R. 890].   Again, it is worth noting that the ALJ found that Plaintiff was more restricted in his limitations than Dr. Nunez found.   There was no evidence of significant mental restrictions.   *Id.*   The opinions of these non-examining state agency consultants were not outdated, as Plaintiff claims, as most of them occurred after the opinions of Plaintiff's treating physicians.   Given these records, substantial evidence supports the ALJ's conclusion that the totality of the record does not suggest that Plaintiff becomes incapacitated by his seizure activity.

Second, treating physicians' opinions on issues that are reserved to the Commissioner, such as whether a claimant is unable to work or is disabled, are not entitled to controlling weight or special significance.   20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *Denomme v. Comm'r of Soc. Sec. Admin.*, 518 Fed.Appx. 875, 878 (11th Cir. 2013).   On January 8, 2010, Dr. Greenberg wrote a letter to Plaintiff and his attorney comparing his past neuropsychological reports from 2005 to the neuropsychological evaluation performed by Dr. Bash on November 6, 2006.   [R. 905].   Dr. Greenberg opined that Plaintiff suffers from a cognitive disability that prevents him

from performing his previous work activity or any other type of work activity. [R. 905-06]. However, this opinion is neither entitled to significant weight nor dispositive because it is an opinion on an issue reserved to the Commissioner. *See* SSR 96-5p.

Third, an order reversing the ALJ's decision because he "provided only scanty reasoning for rejecting the treating source's opinions," as argued by Plaintiff, would be improperly putting form over substance. The ALJ did not regurgitate all of Dr. Greenberg's or Dr. Robison's findings in his decision, but he certainly did fairly consider and discuss them. He also provided adequate reasons for discounting these opinions. It is clear from the ALJ's decision that he considered Dr. Greenberg's and Dr. Robison's opinions but gave them little weight. A careful reading of the ALJ's discussion of Plaintiff's alleged impairments in his decision [R. 21-28], coupled with all of the record evidence, leads to the inescapable conclusion that the ALJ properly considered and discussed the record evidence, including the opinions of Dr. Greenberg and Dr. Robison.

Therefore, the ALJ provided good cause for his decision to discount Plaintiff's treating physicians' opinions and adequately articulated his reasons for doing so. Moreover, the ALJ did not err in the weight he gave to the state agency physical and psychological non-examining sources' opinions because substantial evidence supported the ALJ's conclusion that treatment records failed to support the treating medical providers' opinions.

**2. Dr. Pao**

The ALJ found that "Dr. Pao's opinion given [in a sworn statement] in March 2013 that claimant is limited to a range of sedentary work is given little weight as it is not supported by substantial other evidence in the record." [R. 28]. Plaintiff alleges that the ALJ did not address the entirety of Dr. Pao's opinion or provide sufficient reasoning for rejecting it. [DE

20, p. 22].   However, the Court finds that the ALJ properly considered and discounted Dr. Pao's medical opinion for multiple reasons.   First, Dr. Pao treated Plaintiff from December 27, 2011 through March 15, 2013.   [R. 1561-90].   A claimant must show that they were disabled on or before their date last insured.   *Mason v. Comm'r of Soc. Sec. Admin.*, 430 Fed. Appx. 830, 832 (11th Cir. 2011).   Plaintiff's date last insured was December 31, 2010, so Dr. Pao did not begin treating Plaintiff until almost a year after her date last insured.

Second, the ALJ specifically discussed Plaintiff's treatment with Dr. Pao in his decision. [R. 23].   As the ALJ stated, Plaintiff reported to Dr. Pao that his seizures were occurring one to two times per month and Plaintiff was on medication for the seizures.   [R. 23].   Plaintiff claims that the ALJ did not address the entirety of Dr. Pao's opinion and that the ALJ's reasoning was not specific enough to permit meaningful review.   [DE. 20, p. 22].   However, out of the 1,600-page record in this appeal, Dr. Pao's records, including her sworn statement, were a total of twenty-nine pages and mostly conclusory.   [R. 1562-90].   After reviewing the records, it does not appear to the Court that there would have been much more substantively to say on Dr. Pao's treatment records aside from the ALJ unnecessarily regurgitating the entirety of her records.

Third, for the same reasons provided above, Dr. Pao's opinion that Plaintiff was limited to sedentary work is not entitled to significant or great weight as that is an opinion on an issue reserved to the Commissioner.   *See* SSR 96-5p.   Therefore, the ALJ provided good cause and articulated his reasons for discounting Dr. Pao's opinion.

C.   Whether the ALJ improperly discounted Plaintiff's subjective complaints and credibility

The three-part pain standard requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising

from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt*, 921 F. 2d at 1223. The Court finds that the ALJ followed the "pain standard" discussed in *Holt*. As stated in *Holt*: "If the ALJ decides not to credit such testimony, he [or she] must articulate explicit and adequate reasons for doing so." *Holt*, 921 F. 2d at 1223. After a careful review of the record, the Court finds that the ALJ did articulate explicit and adequate reasons for discrediting Plaintiff's testimony. This Court cannot reweigh the evidence.

Plaintiff contends that the ALJ failed to articulate adequate reasons for discrediting Plaintiff's testimony and therefore Plaintiff's testimony must be accepted as true. [DE 20, p. 24]. Plaintiff asserts that the ALJ's conclusion that Plaintiff's seizures are not as severe as he alleged because he does not have any restrictions on his driver's license is speculation. [DE 20, p. 25]. Further, he claims that the ALJ's reasoning that Plaintiff's seizures are curable and manageable with treatment because Plaintiff was never hospitalized for his seizures or diagnosed with epilepsy is unjustified and unsupported by evidence. *Id.* He asserts that the ALJ erroneously suggested that Plaintiff had no mental limitations because his brain tumor is stable and his MRIs have been unchanged. [DE 20, p. 26]. Plaintiff also argues that the ALJ's statement that Plaintiff's condition is not as limiting as alleged because his physicians "were unable to devise more extensive treatment that they believed would be effective" is incorrect. [DE 20, p. 27]. Finally, Plaintiff alleges that the ALJ ignored Plaintiff's memory deficits when he misleadingly found that Plaintiff's IQ remained within an average range and that Plaintiff maintained generally average mental functioning. *Id.*

Defendant maintains that the ALJ "properly analyzed Plaintiff's subjective complaints of pain and gave proper reasons for finding his allegations regarding his limitations not entirely

credible according to the regulations and rulings." [DE 24, p. 12]. Defendant asserts that the ALJ's conclusion that Plaintiff's allegations were not credible is supported by substantial evidence. [DE 24, p. 13]. Defendant contends that Plaintiff met the pain standard but his allegations were not credible. *Id.* According to Defendant, the medical records do not indicate that Plaintiff's symptoms were as limiting as he alleged. [DE 24, p. 14]. Defendant claims that the opinions of the State agency medical consultants all support the ALJ's credibility determination. *Id.*

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 26]. He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. [R. 25-28]. The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [R. 27].

The ALJ summarized Plaintiff's testimony and Plaintiff's wife's testimony from the hearings. [R. 25-26]. The ALJ found that Plaintiff's "seizure disorder is not as limiting as is alleged." [R. 27]. Plaintiff testified at the hearing on January 19, 2010 that his seizures occurred 4-6 times a month. [R. 50]. However, in November of 2007, Plaintiff reported on average that he had one breakthrough seizure per month. [R. 637]. Later, in December of

2011, Plaintiff told Dr. Pao that his episodes were occurring 1-2 times per month.   [R. 1577]. But at the hearing on remand on March 6, 2013, Plaintiff testified that his seizures were occurring 25-30 times per month.   [R. 88].   Moreover, in Plaintiff's hearing testimony, he stated that before his seizures occur, he feels an "aura" warning him that he is about to have a seizure.   [R. 85].   However, in prior reports, Plaintiff stated that his seizures come on without warning.   [R. 374, 397].

Because of the conflicting evidence, the ALJ gave greater weight to the "functional effects, or lack thereof, of [Plaintiff's] seizure activity."   [R. 27].   The ALJ found that Plaintiff's seizure condition was "curable and manageable with proper treatment."   [R. 27]. He explained that Plaintiff's driver's license was recently renewed in 2011 with no restrictions beyond eyeglasses, Plaintiff was never hospitalized or diagnosed with epilepsy, Plaintiff "retained the ability to engage in personal care, balance a checkbook, keep appointments, drive, follow directions, and engage in leisure activities like fishing and golf," and since the alleged onset date, the MRIs of Plaintiff's brain have remained largely unchanged.   *Id.*

During the hearing, Plaintiff indicated that he maintains a current driver's license and described his daily activities, which include making breakfast, walking his dog, watching the news, reading the newspaper, playing golf, spending time with his wife, doing some laundry, and travelling a few times a year.   [R. 51-52, 60-61, 91].   The ALJ thoroughly discussed these daily activities in his decision.   [R. 26].   The Court finds that the ALJ properly considered Plaintiff's activities of daily living in evaluating Plaintiff's subjective complaints.   *See* 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i).   Moreover, the ALJ clearly only considered these activities to be one factor of many in finding Plaintiff's complaints to not be credible.

The Court finds that the ALJ's decision to discount Plaintiff's testimony about his

subjective complaints is not erroneous in light of the record evidence.   This is a case with an abundance of objective medical information which supports the ALJ's finding.   There is substantial evidence to support the ALJ's denial of benefits to Plaintiff.

      D.   <u>Whether the ALJ failed to meaningfully address the lay evidence of record</u>

In addition to evidence from acceptable medical sources, the ALJ "may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [their] ability to work."   20 C.F.R. § 404.1513(d); *De Olazabal v. Soc. Sec. Admin., Com'r*, 579 Fed.Appx. 827, 832 (11th Cir. 2014).   "Other sources" include non-medical sources such as spouses, parents, other caregivers, siblings, other relatives, friends, neighbors, and clergy.   20 C.F.R. § 404.1513(d)(4).   Social Security Ruling 06-03p provides:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p.

Plaintiff contends that the ALJ erred by not discussing the evidence from lay witnesses. [DE 20, p. 27].   According to Plaintiff, when a lay witness provides evidence about a claimant's symptoms, "the ALJ must ordinarily both consider it and give specific, valid reasons for disregarding the evidence."   [DE 20, p. 28].   Plaintiff asserts that the lay witnesses provided evidence "supporting a degree of memory dysfunction the ALJ refused to acknowledge or fully consider."   [DE 20, p. 29].   Plaintiff claims that the case should be remanded with instructions for the ALJ to properly evaluate the lay evidence of record.   [DE 20, p. 30].

Defendant claims that the allegations of the individuals in their affidavits were

duplicative of Plaintiff's allegations and did not add noteworthy evidence concerning Plaintiff's condition. [DE 24, pp. 14-15]. According to Defendant, by rejecting the subjective complaints of Plaintiff, the ALJ implicitly rejected the duplicative allegations of Plaintiff's wife. [DE 24, p. 15]. Therefore, Defendant contends that the ALJ did not need to specifically discuss the statements of these individuals. *Id.* Further, Defendant argues that Plaintiff failed to show that he was prejudiced because the ALJ did not discuss this evidence. *Id.*

### 1. Plaintiff's Wife's Testimony

Plaintiff's wife testified at the first hearing in front of the ALJ on January 19, 2010. [R. 62-76]. Although Plaintiff's wife did not testify at the hearing on remand, the ALJ discussed Plaintiff's wife's testimony in his decision in determining Plaintiff's RFC, noting that Plaintiff's wife described Plaintiff's activities of daily living and Plaintiff's seizure frequency. [R. 26]. Moreover, the ALJ discussed Plaintiff's wife's testimony more extensively in his first decision. [R. 132-33]. Although the ALJ did not explicitly state what weight he gave to her testimony, it is clear to this Court that the ALJ did consider her testimony and assign her testimony an implicit weight. *Cochran v. Com'r of Soc. Sec. Admin.*, 6:15-cv-662-Orl-DAB, 2016 WL 3218644, *3 (M.D. Fla. Jun. 21, 2016).

Further, the ALJ's error in not specifically assigning a weight to Plaintiff's wife's testimony, if an error at all, is a harmless one. *De Olazabal*, 579 Fed.Appx. at 832. Plaintiff's wife's testimony was cumulative of Plaintiff's own testimony at the hearing and cumulative of the medical evidence in the record. *Id.* Like Plaintiff's hearing testimony, Plaintiff's wife described an average day of Plaintiff and described the character and frequency of Plaintiff's seizures. [R. 70-76]. Because Plaintiff's wife's testimony was cumulative of Plaintiff's own testimony and, as discussed above, the ALJ properly considered Plaintiff's subjective complaints

and testimony, it was harmless error, if any, for the ALJ to not specifically assign a weight to Plaintiff's wife's testimony or provide explicit reasons for not relying on her testimony.  *De Olazabal*, 579 Fed.Appx. at 832.

## 2. Plaintiff's Other Sources' Affidavits

Plaintiff submitted affidavits of Karen Kulak, Robert Freedman, Dalton Novell, Alan Gottlieb, and George Filepp.  [R. 400-12].  All these affiants had a business relationship or personal friendship with Plaintiff and observed Plaintiff's symptoms.  *Id.*  George Filepp alleged that he observed Plaintiff have "dizzy spells" and seizures and that Plaintiff's short term memory has greatly deteriorated since 2000.  [R. 700-01].  Alan Gottlieb claimed that he witnessed Plaintiff have seizures on several occasions in 2002 and 2003 during which Plaintiff would "become extremely dizzy just prior to the onset of the seizure."  [R. 702-03].  Dalton Novell alleged that he personally observed Plaintiff having seizures, including in 2002 when Plaintiff "nearly collapsed" while walking to lunch, and recognized that Plaintiff was losing his ability for public speaking and losing his short-term memory.  [R. 704-06].  According to Novell, Plaintiff "would forget entire conversations and would have virtually no recollection once he was reminded," and Plaintiff's secretary had to start making a schedule for Plaintiff on a notecard each day and placing it in his suit jacket.  [R. 705].

The Court first notes that these affidavits were submitted to CIGNA in early 2005, by Plaintiff's attorney, as part of Plaintiff's appeal of CIGNA's denial of his short-term disability claim.  [R. 383, 400-12].  Although these affidavits are in the record, they were not submitted to the Social Security Administration as "non-medical source" opinions.  They were submitted in the "Matter of Robert Hamilton's Claim for Short-Term Disability Benefits" to CIGNA, more than a year before Plaintiff filed this Social Security claim and almost five years before

Plaintiff's initial hearing before the ALJ.

Moreover, these affidavits were similar, in many respects, to the medical record evidence and Plaintiff's own testimony. They described the character of Plaintiff's seizures and the deterioration of Plaintiff's short-term memory, as did the medical record evidence and Plaintiff himself. Although the ALJ did not specifically discuss these affidavits in his decision, in light of the ALJ's finding that Plaintiff's testimony was not credible, the implication is obvious that the ALJ did not regard the affidavits of Plaintiff's other sources as credible. *Clyburn v. Com'r of Soc. Sec. Admin.*, 555 Fed.Appx. 892, 894 (11th Cir. 2014) (finding that the ALJ did not err by not explicitly discussing statements in a layperson's affidavit because the ALJ expressly rejected the claimant's testimony about the severity of her pain and the extent of her limitations as not credible, which impliedly rejected the statements in the affidavit); *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983) (finding that the ALJ's credibility determination as to a layperson's testimony was "clearly implied" by the explicit ruling as to the claimant's testimony).

## IV. <u>CONCLUSION</u>

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment [DE 20] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 24] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this _14th_ day of September, 2016.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE